## Nelson *v.* Duquesne Light Company et al., Appellants, et al.

38

Argued October 4, 1939; reargued March 18, 1940. Before Schaffer, C. J., Maxey, Drew, Linn, Stern, Barnes and Patterson, JJ.

*Bennett Rodgers,* Assistant City Solicitor, with him *Wm. Alvah Stewart,* City Solicitor, for appellants, Nos. 161, 223 and 224.

*James T. Philpott,* for appellant, No. 209.

*Harry A. Estep,* for appellees, Nos. 161 and 209.

*T. W. Pomeroy, Jr.,* with him *Reed, Smith, Shaw & McClay,* for appellee, No. 223.

*J. Roy Dickie,* of *Dickie, Robinson & McCamey,* for appellee, No. 224.

OPINION BY MR. JUSTICE MAXEY, March 27, 1940:

At 12:30 a. m., December 8, 1935, Robert Messinger, the additional defendant above named, was driving his automobile on Saw Mill Run Boulevard (hereinafter referred to as the boulevard), in a northerly direction towards the City of Pittsburgh. He had in the front seat with him as a guest passenger, David Nelson, husband of Catherine Nelson, the above named plaintiff. The automobile, while proceeding at a speed which Messinger declared was about 30 or 35 miles an hour, collided with a wooden electric light pole located on the highway. As a result of the accident Nelson received injuries which caused his death about a week later.

The boulevard runs north and south in the City of Pittsburgh and is a four lane highway. At a certain point, Nobles Lane (hereinafter referred to as the lane) runs off to the right of the boulevard as one lane roadway up the hill to Carrick. From this point on, the boulevard continues as a forty foot highway around a left curve for a distance of 200 feet when it continues as a thirty foot highway. Nobles Lane is in its direction really a continuation of the boulevard. The boulevard by curving to the left at the lane constitutes a very substantial curve, the degree of which is indicated on

the map exhibit but does not appear in the record. At the converging of the boulevard and the lane there is an intermediate triangular "island" or nontraversable area. The distance from the westerly edge of the concrete boulevard to the northerly, i. e., the broad end, of the island is forty-one feet. The Duquesne Light Company's pole with which the car collided is "122 feet from the point of curve, which is practically the northerly end of the island." The pole is situated in front of a service station of the Standard Oil Company and its distance eastward from the eastern edge of the thirty-foot paved highway is 5.54 feet. The width of the right-of-way of the boulevard at the locus of the accident is 70 feet. The old *paved* road of the boulevard is thirty feet wide; west of this there is twenty feet of unpaved highway, but east of it, i. e., in front of the service station the right-of-way is paved for twenty feet. If we take the fifty foot paved area as *the* boulevard and divide this into northbound and southbound traffic halves, the pole is located two feet westward of the center of the northbound traffic half. The colliding automobile was northbound.

It is apparent from the map exhibit in this case that an automobile traveling toward Pittsburgh and passing the "island" at the curve would, if it continued northerly in a *straight line,* crash into this pole. In order to avoid it a driver would have to veer to the right and pass between the pole on his left and the service station on his right. The pole was painted with black and white stripes for a considerable height. There was a 600 candle power light on the pole itself and similar lights near the traffic island. The pole was erected by the Duquesne Light Company in 1930 to take the place of two poles of theirs which had stood for some time six feet eastward from the edge of the pavement in a then (i. e., before 1930) unpaved portion of the right-of-way. These two poles were in front of a lot of the Standard Oil Company. The latter decided to erect a

service station on this lot and to pave with cement both the area in front of this station and also the 20-foot eastern strip of the right-of-way. The oil company requested the light company to remove the two poles and erect one pole in the right-of-way, 5.54 feet east of the old *paved* right-of-way. The light company secured a city permit for the installation of the pole. The issuance of this permit was under the authority of the Act of May 8, 1889, P. L. 136, sec. 2, which gives electric light companies the power to "erect and maintain the necessary apparatus for supplying light . . . and to distribute the same, with the right to enter upon any public street . . . for such purpose . . . ; Provided" it obtains "the consent of such entry, of the councils of the city or borough in which such streets may be located."

There was testimony that the light on the pole was located on an arm about thirty feet above the street and that the light did not reflect at all at or near the base of the pole. An employee of the gasoline station testified that from the latter part of June, 1935, to October 23, 1935, there were two accidents caused by collisions with the pole in question. He also testified that during the same period there were other machines that struck the pole but he didn't consider them accidents because no serious damage was done. He also said that he saw "cars brush their fenders and bumpers" against the pole and then kept on going without stopping. He saw about "five cars do that" during that period.

The jury returned a verdict for $6,548.75 in favor of the plaintiff and against the City of Pittsburgh and the additional defendant, Robert Messinger. As to the other defendants, the Duquesne Light Company and the Standard Oil Company of Pennsylvania, the jury found that there was no liability, and, as directed by the court, it rendered a verdict in favor of Allegheny County. The city and Messinger appealed.

In deciding the legal questions presented by this record these principles are applicable: (1) Municipalities which have full and complete control over the streets and highways within their corporate limits are liable in damages for injuries sustained in consequence of their failure to use reasonable care to keep them in a reasonably safe condition for public travel. This is true even though the given condition in a street may not technically be a nuisance: *Lawrence v. City of Scranton*, 284 Pa. 215, 219, 130 A. 428. See also *Norbeck v. Philadelphia*, 224 Pa. 30, 73 A. 179.

(2) When a telegraph or an electric light pole is erected in a highway with the consent of the proper authorities, it is *not per se a nuisance*. Dillon on Municipal Corporations, Vol. 3, sec. 1220, says: "Legislative sanction directly given by the legislature, or mediately conferred through proper municipal action, is necessary to authorize the use of streets for the posts and wires of a telegraph or telephone company. If such posts be erected within the limits of a street or highway without such sanction, they are nuisances; but if the erection be thus authorized, they are not."

(3) While the statute authorizes a municipal council to permit the erection of a pole or poles in a highway and thus exempt such poles from the status of a nuisance; the statute does not absolve the municipality from the duty of keeping its streets clear of obstructions which are both dangerous and unnecessary and which with reasonable care could be avoided. It is stated in 2 A. L. R. 496: "While trolley poles erected in a public street do not constitute a nuisance per se, *they must be so placed as not to impede unduly the use of the street by persons on foot or in vehicles* [italics supplied], and, if negligently so placed or constructed as to cause an unnecessary obstruction to traffic, may constitute a nuisance. *Lambert v. Westchester Electric R. Co.*, 191 N. Y. 248, 83 N. E. 977." In 13 R. C. L., page 199, sec. 170, this principle is laid down: "A telegraph, telephone,

or electric light or power line, erected in a street or highway for the purpose of serving the public is not a nuisance if constructed under legislative authority; nor are the poles of such a line nuisances under such circumstances, provided they do not materially interfere with the rights of the abutting owner *or the use of the street for purposes of travel* [citing cases]." (Italics supplied.) In *Little v. Telegraph Co.*, 213 Pa. 229, 62 A. 848, arising from personal injuries sustained by a vehicle coming in contact with a telephone pole near the traveled portion of the highway, it was held by this court that while the right of a telegraph or telephone company to place its poles on the public highways is statutory, yet the company's "right to use the public highways in the construction and maintenance of its lines is qualified and prohibited to the extent that the public should not be inconvenienced in the proper use of the highways." The Act of April 29, 1874, P. L. 73, which was invoked in that case declares that the line "shall not be so constructed as to incommode the public use of said roads, streets or highways." While the Act of May 8, 1889, P. L. 136, conferring the right upon municipalities to give *electric* companies permission to erect and maintain poles on highways, does not *declare* the same restriction, it is legally implied that a municipality cannot consent to an entry by an electric company any more than to a telephone company, in the public highways which places them in an unsafe condition and which amounts to negligence. In 29 C. J., page 680, sec. 444, it is set forth: "Counties and towns are not insurers of the safety of their highways, but must use . . . at least ordinary or reasonable diligence at all times, when practicable, to keep the road reasonably safe in view of the probable traffic. . . . In determining whether a highway is in a reasonable state of repair, its location and character and *the extent of travel* thereon are to be considered [italics supplied]."

In *Kost v. Ashland Borough*, 236 Pa. 164, 84 A. 691, this court held that the fact that a pole was erected by an electric light company does not relieve the borough from the duties of supervision and inspection, and, in an action against the borough to recover damages for the death of a child caused by the falling of a pole, the question was for the jury. This court said in that case: "It was competent for the defendant to show that the pole was not unlawfully upon the street, but had been erected by a corporation that had a legal right to erect it and upon whom the duty to maintain it in a safe condition primarily rested. This fact would not have relieved the defendant from the duty of supervision and inspection, but its duty would have been secondary and the rule in relation thereto is less stringent than that which would apply if the pole had been unlawfully upon the street or had been erected by it and was under its sole management." In *Norristown v. Moyer*, 67 Pa. 355, it was held that plaintiff made out a case of negligence for a jury when it was shown that he was injured by the falling of a pole in the street, erected by citizens years before, the pole having become rotten. That case held further that a municipal corporation, which is bound by its charter to keep its streets in repair, is liable for an injury occasioned by its neglect to do so, and it is not material whether the neglect was wilful or not: *Erie v. Schwingle*, 10 Harris 384, 385. The principle was reiterated that negligence might consist not only of "nonfeasance, that is, omitting to do, or not doing, something which ought to be done, which a reasonable and prudent man would do," but also of "a misfeasance, that is, the doing of something which ought not to be done, something which a reasonable man would not do, or doing it in such a manner as a man of reasonable and ordinary prudence would not do it, in either case leading to mischief or injury." Applying this principle to the instant case, if the pole in the highway was under the circumstances something which it was im-

prudent and unreasonable to have there, the city's tolerating it would be negligence from nonfeasance; its giving its initial consent to having it placed there would be negligence from *mis*feasance.

In the case of *Stern v. International Ry. Co.*, 220 N. Y. 284, 115 N. E. 759, a driver of a car collided with a trolley pole in the center of a city highway, fifty feet wide. Judgment was recovered against, inter alia, the City of Buffalo, "on the ground that the trolley poles were unreasonable and dangerous obstructions." The city council had consented to the erection of the poles and the company placed them in the space between its tracks at intervals of 125 feet. The trial judge told the jury that the railway company and the city were liable if poles located in the center of the street were unreasonable and dangerous obstructions of the highway. The New York Court of Appeals, in an opinion by Judge CARDOZO, said: "Whether that ruling may be sustained is the first question to be determined. . . . The poles, if placed and maintained with due regard for the public safety, are not unlawful obstructions. They are obstructions incidental to the exercise of a statutory right. The statute has not said, however, where the poles shall be located. *The implied condition is therefore attached that they must be so located as to avoid unreasonable danger to travelers upon the highway* [italics supplied]. . . . The railway company was, therefore, free to make its own choice if the choice was not unreasonable. Freedom of selection it had, but not freedom without limits. We do not mean to say that to make out a breach of duty it is enough to show that there was error of judgment. . . . *The question is whether the place chosen is so dangerous and the danger so needless that the choice becomes unreasonable.* [Italics supplied.] If danger in that degree is present, both the railway company and the city are charged with liability. The railway company is liable, because the poles are then a nuisance. The city is liable because the nuisance is not abated.

. . . The question, therefore, is whether there is any evidence that . . . when the accident occurred, the location of these poles was dangerous, and that the danger was unreasonable. . . . We think the jury had the right to find that . . . the center poles have become a menace to the traveler. . . . The very location of the poles gives room for conflicting inferences. Plainly, there was at least some risk of accident; plainly the risk was needless, whatever its degree; plainly, therefore, the inference of fault may be drawn unless the risk was so remote or trifling that reasonable men in the exercise of reasonable care would not have striven to avoid it. In the light of all the circumstances, we think that question was for the jury." Among the circumstances which Judge CARDOZO noted that the jury had the right to consider were "the growth in traffic during 20 years, the change in methods of locomotion, the added chances and dangers of collision, and the need, obvious without evidence, of freeing the space between curb and curb from obstructions which could be made without risk to serve their purpose elsewhere," and the fact that in another section of the same street the poles had been admittedly a danger to public traffic. Judge CARDOZO added: "We place our judgment, not on any of these circumstances singly, but on all of them collectively. Their cumulative weight, we think, makes possible the inference that the center poles had become dangerous, and that the danger was unreasonable." He said further: "These poles were not a municipal improvement. They were not planned and placed by the city. They were planned and placed by the railway. *If their location was dangerous, and the danger was needless* [italics supplied], they violated the implied condition of the franchise, and were in the highway without right. They were no more a municipal improvement than defective rails or slots. . . . The duty of the city was to see that it was kept clear of dangerous and unnecessary obstructions. . . . Error of judgment alone does not carry liability with

it, for error of judgment alone is consistent with reasonable care. But failure to abate dangers which reasonable care would have revealed, will charge the city with liability, and this whether the form of action be negligence or nuisance." He cited with approval the following from *Kiernan v. Mayor, etc., of N. Y.*, 14 App. Div. 156, 43 N. Y. Supp. 538: "It cannot be held as a general proposition that a city may excuse itself from a charge of negligence as to the condition and care of its streets, merely by claiming that it had acted judicially in determining to leave the street in a dangerous condition for public travel."

In *McKim v. Phila.*, 217 Pa. 243, 66 A. 340, a street railway company had authority from the city to use the street and had placed a trolley pole in the middle of the street. It was held that the city was responsible for the death of a man caused by the upsetting of a wagon which had struck a pole and the fact that there was ample space between the curb and pole for teams to pass and repass, did not alter the case. We there said: "Conceding the right of the electric company to place its poles in the center of the street and that, by reason of municipal permission, they do not create a nuisance by being located there, yet there was a duty imposed upon the electric company to exercise the power conferred by the municipality in such manner and way as not unnecessarily to obstruct the highway or interfere with the purpose for which it was primarily constructed. . . . The beneficiary of the authority granted is required to exercise the legislative grant without negligence and with the necessary precaution to prevent injury to another." This court there quoted Smith on "Modern Law of Municipal Corporations," sec. 1097, as follows: "Though the legislature may authorize a person or corporation to do an injurious act which would otherwise be a nuisance; 'if the power be exercised . . . in a way not to seriously injure the public, but is exercised in a way regardless of the public interest, there

will be no legislative protection. The grant of power is in all cases to be exercised in such manner as to least interfere with public rights and interests, and by construction the grant or license is construed in favor of the public. Besides there is a high degree of care to be exercised in carrying out the grant of power in such cases.' " We further said in the McKim case: "In *Morton v. Mayor, etc., of New York,* 140 N. Y. 207, 22 L. R. A. 241, it is held, as stated in the syllabus, that the legislative authority which will shelter an actual nuisance must be express, or a clear and unquestionable implication from powers conferred, certain and unambiguous, and such as to show that the legislature must have intended and contemplated the doing of the very act in question. 'Lawful acts may be performed in such manner, so carelessly, negligently, and with so little regard to the rights of others,' says AGNEW, J., *Pittsburgh, Fort Wayne & Chicago Railway Co. v. Gilleland,* 56 Pa. 445, 'that he who, in performing them, injures another, must be responsible for the damage.' . . . The learned court below erred in . . . directing a verdict for the defendant city. In this state . . . the highways are primarily for the passage of persons on foot and in vehicles. It is the duty of the municipal authorities . . . to keep that fact in view, and while permitting them to be used for other purposes, it should not be done in a manner which would prevent their use by the public or would *render them unsafe and dangerous* [italics supplied]. . . . There is nothing in the ordinance from which even an inference can be drawn that the [permitted] use of Eleventh Street by the company . . . authorized [it] to construct or operate its railway in a manner which would render the street unnecessarily dangerous. . . . These were questions for the jury. If the pole, either in its original construction, or in the manner of its maintenance, was dangerous to the public in the use of the street by day or night, municipal consent would afford the company no pro-

tection. . . . This pole stood nearly in the center of the street where a traveler would presume there was safety."

In *Lamb v. Pike Twp.*, 215 Pa. 516, 64 A. 671, this court held that "though the Act of May 29, 1885, P. L. 29, permits a natural gas company to lay its pipes 'upon and over, under and across' public roads, permission is not given to such company to so lay its pipes as to make travel over public highways unsafe; nor does the act relieve township authorities from seeing that the roads under their supervision continue to be safe for public travel, notwithstanding the location of gas pipes upon them."

In *Cleveland v. Bangor Street R. Co.* (1894), 86 Me. 232, 29 A. 1005, it appeared that a street railway company, under the provisions of its charter and municipal ordinances, erected and maintained a trolley pole in a public highway about 18 inches from the curbstone. In an action to recover damages for personal injuries caused by the collision of a carriage with the pole, it was held that the company was liable in that it had erected the pole at a place which made it dangerous for public travel. That court said: "A careful examination of defendant's charter and the city ordinance discloses nothing which expressly or by implication relieves the company from liability for injuries caused by its negligence or want of care in erecting and maintaining its poles when licensed by the city council, but rather the contrary." In that case the city ordinance gave the street railway company the right "to locate and maintain single or double lines of poles on any street where its tracks may be laid." In charging the jury the court said: "I instruct you that they [the defendants] were bound, in so placing them, i. e., the poles, to have due regard to the rights of the public, and to have had due forethought as to the needs of the public and the danger to the public, and that they were so bound in placing their posts as to not unnecessarily or unreasonably endanger any

person traveling in that vicinity." The Supreme Judicial Court of Maine said further: "The defendant contended that if it located and maintained the pole in question in the public street in accordance with the provisions of its charter and the ordinance of the City of Bangor, it was legally justified; and proof of negligence in doing so would not subject it to an action by a traveler damaged thereby and requested the court to instruct the jury" to that effect. This request was refused. The Supreme Judicial Court held that the refusal was proper.

In *City of Wellington v. Gregson,* 1 Pac. 253, 255, the Supreme Court of Kansas in an opinion by Justice BREWER, later Justice BREWER of the Supreme Court of the United States, held that "the existence of a post or other object large enough to upset a buggy or wagon running over it, within a carriage width of a traveled track, is not necessarily and as a matter of law such an obstruction as renders the city liable for injuries occasioned thereby. It may or may not be such an obstruction, depending upon a variety of circumstances; and, ordinarily, whether it is or not is a question of fact to be determined by the jury."

In *Coan v. Public Serv. Electric & Gas Co.,* 105 N. J. L. 487, 489, 144 A. 917, the power company contended that it was not liable for injuries sustained by the plaintiffs when their automobile collided with an electric light pole in the traveled portion of the highway, since the pole was placed, with the permission of the proper city authorities in the position which it occupied, but the Supreme Court of Errors and Appeals of New Jersey negatived this contention. In *Earp et al. v. Phelps,* 87 A. 806, the Court of Appeals of Maryland held that the question whether a telegraph pole was so placed on a highway as to injuriously incommode its use for the purposes of public travel in violation of the statute was for the jury. In *Kentucky Utilities Co. v. Sapp's Adm'r,* 60 S. W. 2d 976, the Court of Appeals of Kentucky said:

"Under the law in Kentucky, as elsewhere, although an electric light company may have a lawful right to construct a pole line in a highway, nevertheless it is its duty not to locate its poles within the traveled portion of the highway or so close thereto as to make travel on the highway dangerous for those using the highway in the ordinary course of travel."

In *George v. City of Los Angeles et al.*, 79 P. 2d 723, it was held that no different rule should "be applied in a case where the dangerous or defective condition of a street is the result of a plan of construction adopted by the city than in a case where such condition results from the street being permitted to remain out of repair after its construction under some general plan adopted by the municipality." In *Gerberich v. Southern California Edison Co.*, 79 P. 2d 783, it was held that evidence whether a power pole was negligently maintained by defendant power company in the highway was for the jury, as respects defendant's liability for damages sustained when an automobile collided with the pole and the occupants thereof were killed or injured. In *Jafek v. Public Service Co. of Oklahoma*, 79 P. 2d 813, the Supreme Court of Oklahoma held that "as between the traveling public and the company erecting this post, all that could be required was that its location should be fixed at a 'safe and convenient distance beyond the margin of the road as made and used.' When an effort is made to hold it liable for improperly locating its poles, the question is, 'Is the safety of travel endangered?' " In *Ohio Bell Telephone Co. v. Lung*, 129 Ohio St. 505, 196 N. E. 371, it was held that where an automobile guest was killed when an automobile collided with a telephone pole located in an improved portion of the highway 5.1 feet from pavement in "Y" formed at junction, whether telephone company was guilty of negligence in placing the pole in the highway so as to incommode travelers and whether negligence proximately caused guest's death were for the jury. The Supreme

Court of Ohio said: "The argument advanced is that the pole was merely a passive, inactive condition which was rendered injurious by the intervening independent act of the driver of the automobile. It is true that the pole was static, but for the defendant company to carelessly and negligently maintain it in a position where it would incommode the public in its use of the public highway would constitute negligence by a continuing act of malfeasance. In our judgment the act of the driver was not as a matter of law an independent intervening cause, as such act of the driver and the negligence of the telephone company, if any, were existent and concurrent at the time of the collision."

In *Lambert v. Westchester Electric R. Co.,* 191 N. Y. 248, 83 N. E. 977, the Court of Appeals of New York held that "where an electric railroad company is authorized by a city to locate trolley poles along a street, they are not nuisances; *but such permission does not authorize the company to locate its poles so as to unduly and unnecessarily interfere with the public use of the streets* [italics supplied]. Justice HISCOCK in that case said: "Counsel for appellant makes an argument for exemption of his client as matter of law from liability, which seems to be based on the idea that this pole was subject to special considerations; that it was one of those structures necessarily located in the street, and as long as it was not actually in the traveled portion of the street . . . there should be no liability for negligence, even though the collision did occur. . . . The defendant was authorized by the municipality to locate its trolley poles and therefore they were not nuisances. But this permission did not and could not authorize the defendant to so locate its trolley poles that they would unduly and unnecessarily interfere with the use of the streets by the public. . . . The ordinary question is presented whether the defendant did unlawfully and negligently locate its pole in such position, . . . that, in the use to be expected, . . . a collision reasonably

might be apprehended. . . . That question was one of fact for the jury."

The principle widely enunciated by the courts that even though a municipality may permit public service companies to erect poles in a city street, such permission does not absolve either the city or the permittee if the poles are placed as to cause any unnecessary obstacle to traffic, is not in conflict with judicial recognition of the fact that cities may without being negligent permit the erection of piers in city streets to support necessary overhead bridges. What is necessary cannot in itself be negligence. In pre-motor times fountains and monuments also were sometimes erected in wide streets. Such erections being conspicuous and usually made where there were long vistas, were not menaces to the traffic of that era. In the instant case the inference is legitimate that an electric light pole almost in the center of the northbound traffic half of the fifty-foot paved boulevard and only 122 feet from a curve was *unnecessary* and that it was an *obvious menace to traffic.*

The courts have recognized the fact that street obstructions which may not have been a menace to traffic when all street traffic was pedestrian and by horses and carriages, have become menaces under modern traffic conditions when the state authorizes motor vehicles to travel fifty miles an hour, i. e., 74 feet a second. With thousands of vehicles traveling daily over city boulevards at the speed of fast railroad passenger trains, a pole in the direct line of traffic may reasonably be adjudged a menace to public safety.

The question of the negligence of the City of Pittsburgh and of the driver Messinger was properly submitted to the jury. The court would not have been justified in determining as a matter of law that the city was not negligent and that the negligence of Messinger was the sole proximate cause of the accident. As to proximate cause, section 447 of Restatement of Torts, says: "The fact that an intervening act of a third per-

son is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or (b) . . . or (c) the intervening act is a normal response to a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent." This comment is added (p. 1198) : "e. The words 'extraordinarily negligent' denote the fact that men of ordinary experience and reasonable judgment, looking at the matter after the event and taking into account the prevalence of that 'occasional negligence, which is one of the incidents of human life,' would not regard it as extraordinary that the third person's intervening act should have been done in the negligent manner in which it was done." Viewing Messinger as the "third person" and the City of Pittsburgh as the "actor," it cannot be held as a matter of law that the "actor" should not have realized when it permitted the pole to be placed in the line of traffic that a motorist might crash into it, nor can it be said that the motorist's conduct was so "extraordinarily negligent" that the city could not have foreseen it when it permitted the pole to be placed and to remain in the street. The fact that others had crashed into the pole before Messinger did, put the city on additional notice that the pole was a menace to traffic.

In section 453 of Pennsylvania Annotations to the Restatement of Torts, the following appears: "It is not uncommon to have a situation where there may be a reasonable difference of opinion as to whether the actor's conduct was a substantial factor in bringing about the harm, and it frequently occurs that where intervening forces have come into operation there may be a reasonable difference of opinion as to whether they were extraordinary or normal. If there is room for such a reasonable difference of opinion, the question of legal

cause is for the determination of the jury [citing 14 Pennsylvania cases]." In *Kline v Moyer*, 325 Pa. 357, 364, 191 A. 43, this court said: "Where the second actor does not become apprised of such danger until his own negligence, added to that of the existing perilous condition, has made the accident inevitable, the negligent acts of the two tort-feasors are contributing causes and proximate factors in the happening of the accident and impose liability upon both of the guilty parties." In *McCracken v. Curwensville Borough*, 309 Pa. 98, 163 A. 217, we held that the proximate cause of the injuries in that case was the icy condition of the highway. In *Welser v. United Gas Improvement Co.*, 304 Pa. 227, 155 A. 561, we quoted with approval the following from two other jurisdictions: (1) " 'The act of a third person, intervening and contributing to a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable, direct cause of the injury' ": *Lane v. Atlantic Works*, 111 Mass. 136. (2) " 'Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence, and if they are such as might, with reasonable diligence, have been foreseen, the last result, as well as the first and every intermediate result, is to be considered in law as the proximate result of the first wrongful cause' ": *Atchison, etc., R. R. Co. v. Stanford*, 12 Kan. 354. This court in *Helmick v. South Union Twp.*, 323 Pa. 433, 439, 185 A. 609, cited with approval the following from 45 C. J. p. 1322, sec. 883: "Ordinarily . . . it is a question for the jury to determine whose negligence, of several persons contributing to the injury, was the or a proximate cause thereof." See also *Murray v. Pittsburgh Athletic Co.*, 324 Pa. 486, 493, 188 A. 190.

In *Hoyt v. Public Service Electric & Gas Co.*, 187 A. 43, which was an action against a power company for injuries received by an automobile passenger when

struck by a transformer which fell from a pole after the pole was struck by the automobile, the court below did not submit to the jury the question of whether the pole was the proximate cause of the injury. The Court of Errors and Appeals of New Jersey reversed the court below, saying: "Under the circumstances there was evidence from which the jury could have found that the defendant company failed to exercise that degree of care in placing and maintaining the pole and transformer in a public highway which reason and prudence dictate. . . . It is conceded that the construction of the pole was authorized, but no permit can authorize the construction and maintenance in the highway of a structure dangerous to ordinary travel." On the question of proximate cause the court said: "The causal connection would not, as a matter of law, be broken if the collision was an occurrence which might, in the natural and ordinary course of things, have been anticipated as not entirely improbable and the defendant's negligence was an essential link in the chain of causation."

Poles in a city street and in the direct line of traffic are so seldom found under modern traffic conditions that it cannot be held as a matter of law that a driver of an automobile should be held *solely responsible* for an accident if he crashes into such a pole. In *Galliano v. East Penn Electric Co.*, 303 Pa. 498, 154 A. 805, we said that a driver must at all times "have his car under control" and that "having one's car under control means having it under such control that it can be stopped before doing injury to any person in any situation that is reasonably likely to arise under the circumstances." This was a recognition of the fact that motorists meet dangerous situations which are reasonably likely to arise and occasionally meet dangerous situations which are *not reasonably likely to arise.* For example, a motorist could not *as a matter of law* be adjudged negligent if he crashed into a tree or boulder which fell across his path a few seconds before. He might or might not be

negligent, according to the attendant circumstances. Of course, if a motorist sees in time or should have seen in time an object in his pathway, he should take proper steps to avoid running into it. The city authorities know of the constantly increasing great speeds at which motorists can run and are permitted to run (a permitted speed which has increased from 24 miles an hour in 1913 to 50 miles an hour in 1937). The evidence supports the jury's finding that both the City of Pittsburgh and Messinger were negligent.

The evidence would also support a finding that the Duquesne Light Company, which erected the pole, was negligent. This court said, in effect, in *Kost v. Ashland Borough* (supra), the city's duty in respect to a pole that unreasonably obstructs traffic in a highway is secondary to that of the company which erected and maintained the pole. As there is in this record now before us a Certiorari in Appeal ex parte City of Pittsburgh from the judgment in favor of the Duquesne Light Company, and as the verdict *against the city* as a defendant and *in favor of the light company* as a defendant is, on the facts of this case, inconsistent, the verdict and judgment must be set aside and a new trial had.

When this case is tried again, the trial judge should make it clear to the jury that the liability, if any, of the City of Pittsburgh, is only secondary to the liability, if any, of the Duquesne Light Co., and while, if the facts warrant it, a sustainable verdict *could* be rendered against *both* the City and the Light Company, a sustainable verdict *could not* be rendered against the City if the Light Company is exculpated.

The judgments in favor of the Standard Oil Company and in favor of Allegheny County are affirmed. Nothing on this record would warrant findings against these defendants. The judgment in favor of the Duquesne Light Company is reversed with a venire. The judgments against the City of Pittsburgh and the additional defendant, Robert Messinger, are also reversed with a

venire so that on a re-trial of the case the only defendants will be the Duquesne Light Company, the City of Pittsburgh, and the additional defendant, Robert Messinger.

Mr. Chief Justice SCHAFFER and Mr. Justice LINN and Mr. Justice BARNES dissent and on this record would enter judgment n. o. v. for the City of Pittsburgh.