[Civ. No. 15417. First Dist., Div. One. May 4, 1953.]

MARY H. POST et al., Appellants, v. ALAMEDA AMUSE-
MENT COMPANY (a Corporation) et al., Respondents.

Wagener & Brailsford and Augustin Donovan for Appellants.

Brown, Rosson & Berry and Appelbaum & Mitchell for Respondents.

BRAY, J.—In an action for damages for personal injuries claimed to have been sustained from a defective heater in a drive-in theater, the jury returned a verdict in favor of defendant Alameda Amusment Company, a corporation,* and in favor of plaintiffs and against defendant National Heaters, Inc.,† in the sum of $600. From the judgment entered thereon, plaintiffs appeal.

### QUESTIONS PRESENTED

1. Were the verdicts inconsistent?
2. Were the verdicts compromise ones?
3. Alleged misconduct of Theater counsel.

### EVIDENCE

There was practically no conflict in the evidence, except as to the extent of plaintiff Mary's injury. Theater owns the Alameda Drive-In Theater. It purchased portable electric car heaters from National, who manufactured them. Theater

---

*Hereafter referred to as "Theater."
†Hereafter referred to as "National."

advertised the fact that it had car heaters for the use of its patrons. The heaters were equipped with switches manufactured by various firms and were assembled into the heater units by National. National tested each heater and then packaged and shipped them to Theater. Each switch bore the seal of approval of the Underwriters' Laboratories, Inc., which means that it had been passed, checked and approved by the National Board of Fire Underwriters. Theater employed an electrical engineer named Burchett to prepare plans for installation of the electrical set-up and the heaters. His plans were based on, and identical with, the instructions received from National. An electrical contractor named Jarvis installed the heaters. Both Burchett and Jarvis testified it is standard practice to rely on the Underwriters' label and not to make an inspection of the heater switches. They did not take the heaters apart to inspect the switches. There was evidence that National might have used defective switches in assembling their heaters. Burchett testified that the accident was due to a "bad" switch in the heaters. The heaters had been in operation at the Drive-In Theater only five or six days when the accident happened. The one used by plaintiff Mary was the first one to cause trouble, although within five months thereafter, 17 out of the 500 installed were found to have faulty switches. On May 24, 1950, Mary, her husband and her family attended the Drive-In. Feeling chilly, she reached out of the car window and brought through the window the portable car heater. Holding it in one hand, she flicked the switch with the other. "[T]he minute I flicked the switch I got a tremendous electric shock and the whole thing went into millions of sparks and it went into one burning ball, and at that time I dropped it into my lap and at the time I was wearing a wool skirt and I saw wool burning and I looked and saw I was on fire and I knocked the heater on the floor by my other hand and started in to put the fire out. . . ." She then threw the heater out of the car and leaped out. She testified that she "was screaming and hysterical" and "shocked to death." Her husband led her to the theater's Snack Bar where a woman employee rubbed ointment on the flash burns on her hands. She had flash burns on her legs also. The extent of her alleged injuries will be discussed later.

1. *Alleged Inconsistency of Verdicts.*

Plaintiffs contend they were inconsistent, stating, in effect, that if the manufacturer were liable the Theater must neces-

sarily be liable too. To reach this conclusion they have evolved a rather ingenious theory. It is that as the providing of electric heaters to patrons of drive-in theaters, is a novel procedure, and as electrical equipment not properly constructed and maintained is dangerous the duty of a theater owner towards a patron should be more than that of ordinary care, at least that of the highest degree of care, if not that of an insurer. Plaintiffs frankly admit they have no authority so holding. They rely, however, by analogy on *Nelson* v. *Duquesne Light Co.*, 338 Pa. 37 [12 A.2d 299, 128 A.L.R. 1257], and *McCordic* v. *Crawford*, 23 Cal.2d 1 [142 P.2d 7]. The Nelson case, *supra*, does not support plaintiffs' contention as to the degree of care required, as it was held that the duty of a municipality is to use reasonable care to keep their streets in a reasonably safe condition for public travel. There an electric light pole was erected by the light company in the traversable portion of a city street. The light company's duty was to erect its poles so that the public should not be inconvenienced in the proper use of the street. The pole was erected with permission of the city. A guest passenger in an automobile which crashed into this pole sued both the city and the light company for damages for injuries received. The jury gave a verdict in favor of the light company and against the city. The court held that the city's duty in respect to a pole that unreasonably obstructs the traffic in a street is secondary to that of the company which erected and maintained the pole, and that therefore the verdicts which released the defendant with the primary liability but held the one with the secondary liability were inconsistent. Obviously, in our case we have no situation of primary and secondary liability. As will hereafter appear, a different and separate duty was owed plaintiffs by each defendant. They both could have violated their respective duties, but not necessarily so, or either could have violated its duty, in the absence of a violation by the other of its own duty. Again, in *McCordic* v. *Crawford, supra,* 23 Cal.2d 1, the only duty required of the defendants was that of seeing that their premises were in a reasonably safe condition. There a patron of an amusement device, who was injured due to the stitching in the shoulder straps on the device coming apart, obtained a verdict against the lessee of the premises on which the device was situated and the concessionaire who operated the device. The verdict was upheld on the ground that both had violated their respective duties. In our case

there was evidence which might have upheld a verdict against both defendants, had the jury so found. But the evidence did not compel such a verdict. In our case, both defendants were required to use ordinary care, but what constituted due care as to each differed. ▮ The duty of National, the manufacturer and distributor of the heater, was to use reasonable care in the manufacture of the heater and in assembling its component parts and in inspecting and testing it prior to its leaving the plant. (See *Sheward* v. *Virtue,* 20 Cal.2d 410 [126 P.2d 345].) ▮ Theater's duty was to use reasonable care in the installation, inspection and maintenance of the heater. (See Prosser on Torts, § 82, p. 668.) ▮ As National is not appealing from the judgment against it, we are concerned only with the question of whether the evidence discloses that as a matter of law Theater did not use reasonable care in installing, inspecting and maintaining the heater. The evidence does not so disclose. There is evidence that the defective condition of the switch could not be discovered except by opening the heater. This required a special type of key or screwdriver which only the manufacturer had. As said in *O'Rourke* v. *Day & Night W. H. Co.,* 31 Cal.App.2d 364 [88 P.2d 191], the heater "came to the respondent as a sealed unit. Its very nature precluded an internal inspection. . . ." (P. 370.) Liability is imposed if the defective condition of the part could have been discovered by reasonable inspection and tests. "The reasonableness of the inspection and tests used must depend upon the circumstances of the particular case." (P. 369.) We cannot say as a matter of law that defendant, having employed an apparently able electrical engineer and an apparently efficient electrical contractor to install the heater, having installed it in accordance with the specifications of the manufacturer, it having the underwriters' seal on it, and having given it such inspection as was possible without taking the heater apart, did not exercise reasonable care.

In *Sheward* v. *Virtue, supra,* 20 Cal.2d 410, defendants Virtue Brothers manufactured and assembled a chair which it sold to Bullock's Inc. The latter used it in its beauty parlor. Due to an old discolored crack in a leg of the chair, it collapsed while plaintiff wife, a patron of the parlor, was sitting in it, injuring her. The jury returned a verdict in plaintiff's favor against both Virtue Brothers and Bullock's. The trial court granted a new trial as to Bullock's. Plaintiffs appealed from that order. Virtue Brothers appealed from

the judgment against them. The Supreme Court, after pointing out the duty of the manufacturer, stated that the plaintiffs had not seriously pursued their appeal from the order granting Bullock's a new trial, and that they were not contending that in granting the new trial the court abused its discretion. The court would have stated differently had there been anything inconsistent in the judgment imposing liability on the manufacturer, while exonerating the party who, as in our case, supplied the article to the patron. That there is a difference in the duty owed by the manufacturer and that owed by the party supplying the article to the public is set forth in *Honea* v. *City Dairy, Inc.*, 22 Cal.2d 614 [140 P.2d 369], and *Tremeroli* v. *Austin Trailer Equip. Co.*, 102 Cal. App.2d 464 [227 P.2d 923].

██ Whether the facts that the supplying of heaters in drive-in theaters was a new procedure, and that the heater was electrically operated, required a greater *quantum* of care on the part of Theater, were questions for the jury to consider in determining whether Theater exercised the due care required of it. Such facts would not change the *degree* of care required.

2. *Compromise Verdicts.*

Plaintiffs in their briefs content themselves with merely referring to the items of special damages and do not refer to any medical testimony on either side, to sustain their contention that the $600 award was not adequate and therefore proves that the verdicts were compromise ones. Although under the ruling in *Kruckow* v. *Lesser*, 111 Cal.App.2d 198, 200 [244 P.2d 19], we are not required to do so, we have reviewed the evidence.

The special damages testified to were around $1,275. The jury allowed a total verdict of but $600. Dr. Stryble testified that his bill was "about $600." Plaintiffs contend that they were either entitled to nothing or to the full amount of their special damages as well as general damages, and that because the verdict was approximately the amount of Dr. Stryble's bill, the verdict must have been a compromise one. This contention overlooks the most strongly contested element in the case, namely, did Mary receive more than slight injury in the accident, and were the services of the doctors, hospitals, etc., required because of any injury or because of a pathological condition completely unassociated with the injury? The evidence well supports the latter con-

clusion. Of course, plaintiffs "may recover only for the necessary and reasonable expenditures attributable to the injury. It was a question of fact for the . . . [jury] to determine how much of the medical expenses were necessitated by the accident." (*Harris* v. *Los Angeles Transit Lines*, 111 Cal. App.2d 593, 598 [245 P.2d 35].) "The extent of plaintiff's disablement, its originating causes and the degree to which defendant's negligence was responsible for producing it were the subject of dispute between the parties. There is much diversity of opinion on the matter in the medical testimony. . . . Upon the good faith, experience and sound discretion of the trier of the facts must rest the delicate task of separating fact from fancy and divesting the kernel of truthful description from the shell of exaggeration in determining the actual extent of plaintiff's injury and suffering. . . . Where there is conflict in the evidence as to the cause or extent of plaintiff's maladies, it is for the trial court to decide how much of the pain and suffering stemmed from the accident. (See *Lee* v. *Nanny*, 38 Cal.App.2d 90 [100 P.2d 832].) . . . When viewing the evidence in the light most favorable to supporting the judgment, it is patent the court was not convinced plaintiff had sustained her burden of proving that the ills she described were all caused by defendant's negligence." (Pp. 598, 599.)

It would serve no purpose to set forth the medical evidence in detail. The testimony of both plaintiffs, her mother, and plaintiffs' doctors would support a finding that her condition and the subtotal thyroidectomy performed less than three months after the accident, were caused by and resulted from the accident. Dr. Stryble admitted that because he could find no medical literature justifying his conclusions, he had some doubt whether the goiter and the breast condition were the result of shock, although it was his opinion that they were. He also testified that in his experience he had never had a case in which breast changes resulted from a shock. On the other hand, the testimony, some of it from her own doctor, showed that from her early 'teens Mary had had a slight enlargement of her thyroid, because of iodine deficiency. (Her mother had had an operation for goiter.) For a considerable period before the accident she ran a constant fever. Her difficulty was due to a goiter of the diffused colloid type, which two medical men, one a goiter specialist who had operated approximately 1,000 goiter cases, testified could not possibly be caused by shock, emotion or emotional upsets. It

was this type of goiter which was removed. Nor could the condition in her breasts of which Mary complained have been so caused. As the jury obviously believed defendants' medical witnesses, they found against plaintiffs' contention and the testimony of their witnesses that her operation and condition were due to psychosomatic or emotional disturbances caused by the accident. ■ Therefore the jury could very well have found that most of the expenses incurred were not proximately caused by the accident, and hence it cannot be assumed that in limiting plaintiff's recovery to $600 the jury were doing so on a compromise basis, or that the $600 awarded was the "about $600" of Dr. Stryble's bill.

Cases like *Donnatin* v. *Union Hardware & Metal Co.*, 38 Cal.App. 8 [175 P. 26, 177 P. 845], *Bencich* v. *Market Street Ry. Co.*, 20 Cal.App.2d 518 [67 P.2d 398], *Wallace* v. *Miller*, 26 Cal.App.2d 55 [78 P.2d 745], and *Hughes* v. *Schwartz*, 51 Cal.App.2d 362 [124 P.2d 886], cited by plaintiffs, are not in point, for the reason that in those cases there was no issue, as here, as to whether the injuries were caused by the particular accident or due to a preexisting cause.

■ The question of whether the damages awarded were adequate was undoubtedly presented to the trial court on the motion for new trial. ". . . the question of the award of damages and their amount is primarily one for the jury; . . . on a motion for new trial the trial judge sits as a thirteenth juror; . . . it becomes his duty to again weigh the evidence and its sufficiency and measure the credibility of the witnesses; . . . in so doing it is also his duty to consider the adequacy or inadequacy of the amount of damages awarded; . . ." (*Sassano* v. *Roullard*, 27 Cal.App.2d 372, 373-374 [81 P.2d 213]; see, also, *Gersick* v. *Shilling*, 97 Cal.App.2d 641 [218 P.2d 583].)

In *Ortzman* v. *Van Der Waal*, 114 Cal.App.2d 167 [249 P.2d 846, 252 P.2d 7], the circumstances were somewhat similar to those here. There the plaintiff claimed that the pain in her breasts and the masses formed there which had to be removed by surgery were caused by the accident in question. Her medical experts testified that in their opinion they were so caused. Defendant produced no medical testimony. The plaintiff had an extensive medical history, more so than plaintiff in our case. The jury awarded plaintiff only $100. Plaintiff appealed primarily on the ground of the inadequacy of the damages. ■ In upholding the verdict the court referred to rules which are applicable to our case,

that even though medical experts concur in their opinion (they did not concur here), the jury are not bound by those opinions but are required to decide the issue upon their own judgment assisted by the statements of the experts. The jury were entitled to take into consideration the reason given for the opinions, the previous medical history of the plaintiff, and the interest of the plaintiff in the case when relating her subjective symptoms, both to the medical men and to the jury. The court then stated that "In the light of their verdict it is but reasonable to conclude that the jury disbelieved the appellant's testimony and determined that she suffered no injury to her breast as a result of the accident. . . . Moreover, the trial judge who had the opportunity of seeing and hearing the witnesses, in denying appellant's motion for a new trial, thereby expressed his approval of this implied finding, and hence this court is powerless to disturb the same." (P. 231.)

3. *Alleged Misconduct.*

■ Generally the charge is that counsel for Theater deliberately and without factual support attempted to injure Mary in the eyes of the jury by attacking her sanity and family relationships, and attempting to show she had been sterilized. As to her sterilization, no objection was raised to questions of Dr. Stryble concerning that fact. The cross-examiner asked the doctor if he had examined the 1947 hospital records when she had a hysterectomy. He replied that he had not. He was then asked, "You don't know whether her family history at that time was bad and whether she was a mental case——" Plaintiffs interrupted, assigning the question as misconduct. The court immediately admonished the jury to disregard the question. Shortly thereafter the doctor testified that Mary told him she had been sterilized. He was then asked if she had told him that she had had a hysterectomy. He said that she had not, that she said she had a "suspension." He was then asked if he did not know as a fact that she had had a hysterectomy. The doctor replied that he did not believe she had. Theater's counsel then stated, "I am going to bring someone here from the hospital if necessary to prove these other records." Plaintiffs assigned this statement as misconduct. The witness said, before the court could rule, "I believe the word is hysterotomy." The court then said, "Just a minute, Doctor. The record you are looking at is not in evidence and I will sustain the objection." Theater's counsel then asked, "Doctor, did she

tell you at that time she had been having a lot of trouble with her family?'' Plaintiffs objected and assigned the question as misconduct. The court sustained the objection. Even though counsel did not later prove the hospital records which he said he would, a reading of the record fails to show deliberate misconduct on the part of Theater's counsel. The questions were obviously designed to show that Mary's emotional disturbance existed and was caused prior to the accident. While, once the doctor had answered he had not seen the hospital records, he should not have been asked concerning their contents, the record fails to disclose that counsel was actuated by ulterior motives rather than by a certain over-zealousness in the heat of contest. (See *Lafargue* v. *United Railroads*, 183 Cal. 720, 726 [192 P. 538].) The same is true of a remark made by him when a certain line of questioning had been successfully objected to, to the effect that he did not give up easily, he would keep trying. Incidentally no objection or assignment was made to this remark. Mary's antecedent medical history as testified to by her mother, herself and the medical men, shows that Theater's counsel's theory as carried into his questions was not made out of whole cloth. While the court should have admonished the jury instead of in most instances merely sustaining the objection, counsel's actions were not prejudicial. The court denied a motion for new trial. We do not know if these matters were called to the attention of the trial court at that time. They should have been. (*Harrison* v. *Harter*, 129 Cal. App. 22, 32 [18 P.2d 436].) Presumably they were. ''The trial judge is in a much better position than an appellate court to determine whether the verdict in a case is probably due wholly or in part to such alleged misconduct. . . .'' (*Lafargue* v. *United Railroads, supra,* 183 Cal. 720, 724.) Obviously the situation here was entirely different than in the four cases cited by plaintiffs: *State* v. *Patton,* 102 Mont. 51 [55 P.2d 1290, 104 A.L.R. 76], where in a bastardy proceeding questions were asked prosecutrix such as with reference to a man whom she had not seen for at least a year prior to the time of conception of her child, which could only be for the purpose of discrediting prosecutrix and besmirching her character; *Ingram* v. *United States,* 106 F.2d 683, where in a prosecution of defendant for possessing morphine, his wife who was his principal witness was cross-examined, not on any subject brought out on direct examination, but concerning her private life; *McDonald* v. *Price,* 80 Cal.App.2d 150

[181 P.2d 115], where, in an action for damages for the wrongful death of her husband, the wife was asked if she knew that the husband had pleaded guilty to a certain felony and three certain misdemeanor charges, no evidence of which was produced or offered to be produced (it was pointed out in that case that not only did the examiner state positively in his questions facts which he made no effort to support but that the evidence which was attempted to be elicited was immaterial); and in *Mangino* v. *Bonslett,* 109 Cal.App. 205 [292 P. 1006], where the trial court granted a new trial in an action for personal injuries because of the repeated statements of defense counsel that the real plaintiff was an insurance company.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.