**Hart v. PennDOT**

C.P. of Lehigh County, no. 96-C-863.

*Mark K. Altemose* and *Jerry R. Knafo,* for plaintiffs.
*William A. Slotter,* for defendant PennDOT.
*Rudolph Zieger Jr.,* and *Frank G. Procyk,* for defendant PP&L.
*Charles J. Fonzone,* for additional defendant.

STEINBERG, *J.,* June 17, 1998—Before this court are the motions for summary judgment of defendants PennDOT and PP&L. Upon consideration of the parties' briefs and after oral argument thereon, PP&L's motion is granted and PennDOT's motion is granted in part and denied in part in the manner and for the reasons which follow.[1]

This action arises out of a single-vehicle accident which occurred on August 6, 1994. On that date at approximately 9:47 p.m., defendant Aaron Kneller, then 19 years old, was driving his mother's 1994 Honda Prelude on the roadway known as Powder Valley Road. While attempting to negotiate a left-hand curve in the roadway, Mr. Kneller lost control of the vehicle after

---

1. After oral argument, we granted defendant Upper Milford Township's motion for summary judgment which was opposed only by PP&L.

its right front tire engaged a mound of anti-skid material. The vehicle slid off the traveled portion of the roadway and subsequently collided with a utility pole. The pole was located within a PennDOT right-of-way, approximately one foot and 10 inches off the edge of the paved area of the road. PP&L owned, installed, and maintained the pole.

During his deposition, Mr. Kneller related that he had traveled on Powder Valley Road as a driver or passenger on other occasions prior to the night of the accident. (Deposition of defendant Aaron Kneller at 9-10.) When describing the accident, Kneller stated that his vehicle approached the curve at a speed of approximately 30-40 miles per hour. (Kneller deposition at 19-20.) He further said that after the tire caught the gravel, he applied the brakes, and the vehicle skidded prior to striking the pole. (Kneller deposition at 25-28.) The Kneller vehicle skidded approximately 115′ before impacting the pole. (Robson report at 2, police accident report in exhibit C of plaintiffs' brief in opposition to defendant PP&L's motion for summary judgment.) Melissa Hart, the passenger, was knocked unconscious, and according to her deposition, has no recollection of the accident. (Plaintiff Melissa Hart's deposition at 11.)

No adverse weather conditions existed at the time of the accident and the cause of Mr. Kneller's impact with the utility pole is dependent upon the interpretation of his statements to Trooper Andreuzzi. Specifically, Trooper Andreuzzi reported that Mr. Kneller stated that while his attention was diverted when reaching for his cigarettes, the vehicle hit gravel in the roadway causing him to lose control of his vehicle. In Mr. Kneller's deposition, however, he admits to reaching for his cigarettes, but denies that he ever took his eyes off the

road as he approached the curve: "the right front tire caught into the gravel and started to slide . . . I braked . . . the brakes locked up . . . I totally lost control . . . the car slid right into the pole." (Kneller deposition at 25-27.)

Regardless of the interpretation of the events immediately prior to the accident, the parties agree that PP&L utility pole I.D. number 61847/542388 and/or PP&L A-19102 was erected on or about March 15, 1968, and remained at its location without incident until the 1994 Honda Prelude disturbed its peaceful existence. According to plaintiffs' brief, the "average daily traffic volume as of 1992 was 260 vehicles per day." (Plaintiffs' brief in opposition to defendant PP&L's motion at 3.) It would then appear that over two hundred vehicles per day fortuitously passed the pole without a problem.

Following the above-described accident, the plaintiffs, Melissa J. Hart, and George and Crystal Hart, individually, as husband and wife, and as parents and natural guardians of Melissa Hart, instituted this action in negligence against the defendants PennDOT and PP&L by way of complaint filed on or about April 15, 1996. Thereafter, plaintiffs filed a second amended complaint on or about June 7, 1996, and a third amended complaint on or about July 23, 1997. Aaron Kneller was also added as an additional defendant.

The standard for determining a motion for summary judgment is well-settled and has been summarized recently by our Supreme Court as follows:

"Summary judgment may be granted only in cases where it is clear and free from doubt that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. The moving party has the burden of proving the nonexistence of any genuine issue of material fact. The

record must be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Salazar v. Allstate Insurance Company,* 549 Pa. 658, 662, 702 A.2d 1038, 1040 (1997) (citation omitted); see also, Pa.R.C.P. 1035.2(1).

Summary judgment also is appropriate where the party who bears the burden of proof has failed to produce facts essential to establish a prima facie case *prior to trial.* See Pa.R.C.P. 1035.2(2); *Eaddy v. Hamaty,* 694 A.2d 639 (Pa. Super. 1997); see also, *Novak v. Kilby,* 167 Pa. Commw. 217, 647 A.2d 687 (1994) (failure to establish an essential element of actionable negligence is grounds for summary judgment); *Caldwell v. Commonwealth,* 120 Pa. Commw. 358, 548 A.2d 1284 (1988) (a trial judge may grant summary judgment where there is insufficient evidence to justify an inference of negligence and causation).

## I. MOTION FOR SUMMARY JUDGMENT BY PP&L

Plaintiffs base their allegations of negligence against PP&L upon two theories: (1) PP&L's placement of the pole "on the outside of a curve on a rolling rural road" created a dangerous and hazardous condition of which they were aware but failed to remedy; and (2) PP&L's failure to obtain a highway occupancy permit and failure to follow PennDOT's setback regulations in effect at the time of the installation of the pole constituted negligence per se. Plaintiffs also allege that the circumstances surrounding the accident were reasonably foreseeable, and therefore, the negligent placement of the pole was the proximate cause of the injuries.

## (a) *PP&L's Negligence at Common Law*

In PP&L's brief in support of its motion for summary judgment, the company concedes that it has a duty toward motorists to avoid the placement of utility poles "in such a location as to cause an unreasonable and unnecessary risk" of harm. (Brief in support of motion for summary judgment by defendant PP&L at 9.) However, in the case sub judice, PP&L argues that plaintiffs have failed to show that PP&L breached its duty or that there was any causal connection between an alleged breach and the injury sustained by Melissa Hart.

Any analysis that attempts to shed some light on this issue must go back 58 years and begin with a review of *Nelson v. Duquesne Light Company,* 338 Pa. 37, 12 A.2d 299 (1940). The pole in *Nelson* was on the highway, and as described, "an automobile traveling toward Pittsburgh and passing [an intermediate triangular stand] at the curve would, if it continued northerly in a *straight line,* crash into this pole. In order to avoid it a driver would have to veer to the right and pass between the pole on his left and the service station on his right." *Id.* at 40, 12 A.2d at 301. (emphasis in original) Not only was the placement of the pole on December 8, 1935 questionable, but the prior history included a number of accidents. In its analysis, the Supreme Court quoted from the opinion of then Judge Cardozo in *Stern v. International Ry. Co.,* 220 N.Y. 284, 115 N.E. 759 (1917), wherein under similar circumstances it was important to answer "whether the place chosen is so dangerous and the danger so needless that the choice becomes unreasonable." *Nelson* at 45, 12 A.2d at 303.

The Superior Court in *Scheel v. Tremblay,* 226 Pa. Super. 45, 46, 312 A.2d 45, 46 (1973), considered a

pole which was located "10 inches from the paved portion of the road, was unlit, and apparently unmarked by reflectors." The road in question was described as "particularly dangerous" and on which there had been "a large number of accidents." *Id.* at 47, 312 A.2d at 46. Additionally, due to a protruding rock, drivers proceeding in a westbound direction would naturally veer into the middle or eastbound lane of travel. As a result, drivers proceeding eastbound might tend to steer to the shoulder and come face to face with the pole. The Superior Court concluded that "[l]iability is not . . . limited to those situations in which the pole is located in the roadway itself, but may be imposed where the placement of a pole close to the edge of a highway constitutes a foreseeable and unreasonable risk of harm to users of the highway." *Id.* at 48, 312 A.2d at 47. (footnote omitted)

A careful reading of *Scheel, supra,* does not disclose that liability was imposed simply because the pole was in close proximity to the edge of a highway. Instead "the conditions of the highway are critical in determining whether the location of a utility pole adjacent thereto constitutes an unreasonable risk of harm to users of the road." *Id.;* compare *Saylor v. Green,* 165 Pa. Commw. 249, 645 A.2d 318 (1994) (not foreseeable that a driver would inexplicably lose control and strike fence post three feet from the side of the road on a clear day and at a location where there was only a slight bend in the road).

Other cases in which summary judgment has been granted, while factually distinguishable, provide effective guidance to resolve the within case. In *Novak v. Kilby,* 167 Pa. Commw. 217, 647 687 (1994), the involved vehicle crossed a two-lane road, and crashed

into a wooden post, cable guardrail, and a telephone pole directly behind the guardrail. The driver contended that the telephone company "had a duty to move the pole because the pole, located on a curve of the state highway, 5 1/2 feet from the edge of the pavement and across the road from the lane in which [the driver] was travelling, constituted a foreseeable and unreasonable risk of harm to users of the highway." *Id.* at 221, 647 A.2d at 689. Additionally, like the within case, it was asserted that the pole did not comply with PennDOT regulations which recommended that poles be placed a specified distance from the edge of the pavement. The Commonwealth Court found that no duty was created by statute or regulation, and the driver "had already lost control . . . before striking the cable guardrail and the pole located behind it." *Id.* at 225, 647 A.2d at 691. The court further stated that "[n]othing in the record indicates that the [driver] needed to swerve to avoid the pole or that the natural layout of the road funnelled cars toward the pole." *Id.* The court also found it of importance that the pole had existed without incident for nearly 50 years. *Id.;* see *Caldwell v. Commonwealth,* 120 Pa. Commw. 358, 548 A.2d 1284 (1988) (summary judgment appropriate where telephone company's duty not to incommode or unreasonably interfere with public use of highways and roads does not extend to vehicles which completely leave the highway out of control due to extraordinary occurrences which are foreseeable); *Contey v. New Jersey Bell Telephone Co.,* 643 A.2d 1005 (N.J. 1994) (no liability imposed upon utility company, instead PennDOT is primarily responsible for insuring that appropriate safety standards are satisfied). In *Contey,* the Supreme Court of New Jersey

seems to provide a more appropriate framework for analyzing these types of cases. However, it is not within the province of this court to utilize such a framework in this case.

The plaintiff relies heavily upon *Talarico v. Bonham,* 168 Pa. Commw. 467, 650 A.2d 1192 (1994), in which injuries occurred when a vehicle crossed into the other lane of travel and struck an electric pole, eight feet from the edge of the paved roadway. It is important to recognize that in *Talarico,* PP&L was on notice prior to the placement of the pole of "numerous instances of the cars going off the road in the area." *Id.* at 474, 650 A.2d at 1195. Disregarding that information and alternative locations, PP&L installed the pole at the dangerous site. Therefore, there was sufficient evidence to establish that PP&L breached its duty owed to the public.

It is clear from all of the cases that a duty to the public is not created to place poles a certain distance from the roadway merely because vehicles might leave the roadway. Instead, as then Judge Cardozo concluded, an examination of the placement requires a determination of its dangerousness in conjunction with the unique circumstances of its location. Otherwise, the placement of a pole on a straight stretch of roadway, but near the edge of the roadway, would also subject their owners to liability without any analysis of prior accidents, contours of the road, or other available alternatives. All of the cases in which liability was imposed are dependent upon the placement of the pole when analyzed with the unique characteristics of the roadway.

The pole in question in this case, like the pole in *Novak, supra,* had managed to remain accident-free for a considerable number of years. It was only a unique set of circumstances which ended with its involvement

in this accident. Additionally, this court was presented with photographs of the accident site, and while the roadway is curved, it is not dramatic in appearance. According to plaintiffs' expert, "[t]he radius of the left-hand curve was measured to be about 180 feet, with the curve beginning about 315 feet north and ending about 15 feet north of the struck pole." (Robson report at 3.) Mr. Robson further stated: "The asphalt pavement is in good condition and is marked with double yellow center lines. The lanes are about 11.5 feet wide. There are no edge lines." (*Id.*) Therefore, neither the prior history nor the contour of the roadway would lead to the conclusion that the placement of the pole created an unreasonably dangerous condition. While the plaintiffs' argument that the placement of the pole was not the most appropriate placement and an alternative placement would have avoided the impact are both accepted, those deficiencies do not equate to a breach of duty on the part of PP&L.

The court is not unmindful that each year approximately 1,500 persons die and 65,000 injuries occur due to vehicle-utility pole accidents. However, even though a pole placed further away or underground or the use of a breakaway pole may have avoided or mitigated the accident and injuries in this case, that does not equate to proving a breach of duty by the utility company. See *Contey, supra* at 1008.

### (b) *PP&L's Negligence Per Se*

Plaintiffs' remaining argument is that PP&L's alleged failure to secure a highway occupancy permit from PennDOT and to comply with PennDOT's distance requirements constitute negligence per se. Initially, we note that the record is not clear as to whether PP&L failed to obtain a permit. PennDOT admits that it is

unable to locate any record of a permit or application for a permit by PP&L for the installation of the pole at the scene of the accident. (Answer of PennDOT to plaintiffs' requested admissions, nos. 12, 25, 27.) PP&L admits only that it has made a reasonable search for documentation evincing the existence of a permit, and that the search has been fruitless. (Answers by the defendant PP&L to plaintiffs' request for admissions, nos. 25, 26, 27 through 29.) Because we must view the record in the light most favorable to the non-moving party for the purpose of the within motions for summary judgment, this court finds that if neither PennDOT nor PP&L have any record of an application for or receipt of a highway occupancy permit for the pole in question, then none exists. We turn next to the question of whether PP&L's failure to obtain the permit and its location of the pole only 1′ 10″ from the paved edge of Powder Valley Road constitute negligence as a matter of law.

Four requirements must be met to prove a claim based on negligence per se:

"(1) The purpose of the statute [or regulation] must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;

"(2) The statute or regulation must clearly apply to the conduct of the defendant;

"(3) The defendant must violate the statute or regulation;

"(4) The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries." *Wagner v. Anzon Inc.,* 453 Pa. Super. 619, 627, 684 A.2d 570, 574 (1996), *alloc. denied,* 700 A.2d 443 (Pa. 1997).

In 1968, a provision of the State Highway Law required PP&L to obtain a permit prior to the installation of the utility pole on Powder Valley Road. The provision

is set forth at 36 P.S. §670-411 and states in relevant part:

"[N]or shall any telephone, telegraph, or electric light or power poles, or other structures, be erected upon, over, or in any portion of a state highway, nor shall any opening be made therein, except under such conditions, restrictions, and regulations, and subject to the payment of such fees for permits for the placing of such structures and openings, as may be prescribed and required by the department. . . .

"Any person failing to obtain such a permit before doing any work on any highway for which a permit is required by this section shall, for every such offense, be sentenced, upon conviction in a summary proceeding, to pay a fine not exceeding $100 and costs together with the cost of restoring any highway. . . ."

At the time, the "conditions, restrictions, and regulations" governing the installation of utility poles were specified in Form 945-B, entitled "General provisions and specifications regulating occupancy of state highway right-of-way," which was referenced in and attached to the standard permit in 1968.[2] (Answer of PennDOT to plaintiffs' requested admissions, nos. 40-42; Robson report at 15.) Paragraph 30 of Form 945-B states: "in all cases a clear space greater than *the width of the berm or shoulder* must be preserved between the near face of the poles and the edge of the improved or traveled road or highway . . . ." (Robson report at 15.) (emphasis added)

According to plaintiffs' expert, Powder Valley Road, also known as SR 2025, had a shoulder width of zero

---

2. Regulations governing the installation of utility poles were not codified until 1979. See 67 Pa.Code §459.1 et seq., entitled "Occupancy of highways by utilities."

feet. (Robson report at 4.) Since SR 2025 had no shoulder at all, PP&L's placement of the pole anywhere outside the traveled portion of the road would not have violated the above-stated regulation. It appears that the PennDOT right-of-way extended 16 feet, six inches from the center of the road, which would limit any pole placement to five feet from the edge of the surface of the road. Mr. Robson in his analysis concludes that if placed at the outer limits of the right-of-way (five feet) as opposed to 1′ 10″ from the edge of the roadway that the additional distance "would have been sufficient for the Kneller vehicle either to have avoided the pole or to have substantially reduced the severity of impact." (Robson report at 16.) However, while the current desired minimum dimension is 30 feet from the edge of the pavement, as Mr. Robson points out, PennDOT policies concerning utility poles have existed since 1959 and policies existing in 1976 recognized that "on many existing highways constructed within minimum rights-of-way under old design criteria, there is no definite width of clear roadside area." Furthermore, from 1977 until 1987, the policy was "to accept poles where they are unless the poles are twice broken by auto crashes." While that policy was rewritten in 1987, it does not appear that PP&L violated any identifiable PennDOT regulations when the pole was erected in 1968.

Although PP&L's failure to obtain a permit was a violation of section 670-411, PP&L did not violate the criteria contained therein. Additionally, it would appear that the purpose of the statutory permit requirement contained in section 670-411 was not to protect against the particular hazard of vehicle-pole impacts. *Wagner, supra* at 627-28, 684 A.2d at 574. In that regard, section

670-411 was not intended to protect an individual such as the plaintiff who is seeking to recover pecuniary losses for that harm. *Id.* at 627-28, 684 A.2d at 575. Therefore, PP&L's conduct was not negligent per se.

Plaintiffs also suggest that PP&L did not comply with its own recommendations concerning utility pole placement and that this constitutes negligence per se. (Robson report at 18-19.) However, Mr. Faisetty, the area operation manager and an employee of PP&L since 1973, was unable to confirm any written policies pertaining to the appropriate distance for pole placement from the edge of the roadway. For example, Mr. Faisetty responded to one such inquiry by stating: "I'm not aware of any that specifically says that you have to be so far from an edge or that, no, I'm not." (Deposition of John D. Faisetty at 49.) Following a review of his deposition and distilling its contents, it appears that rather than definitive guidelines, "rules of thumb" applied. Specifically, the following exchange offers some assistance:

"Q. What has been the rule that you have followed in placement of the poles in the transmission line, distribution line?

A. Okay. We use rules of thumb, okay. My first goal is to put the pole on private right-of-way. And that again does not matter to me the distance from the roadway. It's to get it off of the highway road limits. That would be my first design guideline.

We have to apply to the property owner for permission to do that. And if there's trees or other obstructions, permission to cut trees, remove obstructions to allow us to do that. That would be my first goal.

If the property owner feels that he does not allow— does not want us to do that, would not allow it, then

I would be forced in completing my task to put the pole on highway right-of-way in such a place as to meet their permit requirements.

Q. So when you say they're, you mean PennDOT's permit requirements?

A. PennDOT's. Or if it's a municipal road, the permit requirements of the municipality.

Q. Between 1973 and 1994, do you know if it was the custom or habit of PP&L to install telephone poles for distribution lines within 2 feet of the traveled portion of a roadway?

Mr. Procyk: Objection to the form of the question. You can answer. I take it there's no curve involved here? This is just a straight question as to distance from traveled portion to pole?

Mr. Altemose: Right.

Mr. Procyk: Objection to the form.

A. At this point, depending on the situation, that would not be our normal place to put the pole at a new installation.

Q. Has this been—I said from 1973 through 1994. Are you saying that wouldn't have been the normal place during the entire time you had been working at PP&L?

A. For a new location?

Q. Correct.

A. Correct.

Q. Why not?

A. Again, my normal place would be back on private right-of-way or just inside the highway right-of-way line.

Q. You would try to move it as far from the road as you could?

Mr. Procyk: Objection to form. You can answer. A. Yes." (Faisetty at 50-52.)

Mr. Faisetty was also asked whether he would have considered it safe "to place a pole within two feet of the edge of a traveled way," and he responded that "depending on the circumstance, it would be safe." (Faisetty at 75.) Thereafter, counsel for the plaintiffs questioned him about straightaways, gentle and moderately sharp curves, the placement of a pole less than two feet from the edge of the roadway within a curve, all with mixed results. Even if Mr. Faisetty's deposition could be interpreted as demonstrating that the placement of the pole was inconsistent with the internal policies, that does not translate into a conclusion of negligence. Likewise, if the placement complied with PP&L's regulations that would not prove that a breach of duty was not committed. It is not policy but rather placement that is the relevant consideration.

For the foregoing reasons, we conclude that PP&L is not liable as a matter of law for the injuries sustained by Melissa Hart.[3]

## II. MOTION FOR SUMMARY JUDGMENT BY PennDOT

### (a) *Sovereign Immunity*

In its motion for summary judgment, PennDOT raises the defense of sovereign immunity to the imposition of liability for the alleged dangerous conditions created by the accumulation of anti-skid material on the outside edge of the traveled portion of the roadway and the location of PP&L's utility pole within PennDOT's right

---

3. In light of our disposition of plaintiffs' breach and negligence per se arguments against PP&L, we need not address the issue of causation.

of way.[4] Specifically, PennDOT asserts that the real estate exception to sovereign immunity, set forth at 42 Pa.C.S. §8522(b)(4), does not apply to the anti-skid material because it is a condition "on" and not "of" the realty. PennDOT also argues that the pole is not "of " the realty because PennDOT did not own the pole nor can it be considered a fixture.

Plaintiffs respond that *all* the conditions of Powder Valley Road at the location of the accident, *i.e.,* the accumulation of anti-skid material, the substandard roadway, and the location of the utility pole, "combined to create a defective roadway." (Plaintiffs' brief at 19.) Plaintiffs argue that the within case is factually indistinguishable from *Fidanza v. PennDOT,* 655 A.2d 1076 (Pa. Commw. 1995), *alloc. denied,* 542 Pa. 677, 668 A.2d 1138 (1995), and therefore, assert that where "numerous conditions [are alleged to have] made the road dangerous, some being 'of ' and some being 'on' the real estate, the claim falls within the real estate exception and the case must be submitted to the jury." (Plaintiffs' brief in opposition to defendant, PennDOT's motion for summary judgment at 20.)[5]

A Commonwealth agency will be immune from suit pursuant to the Sovereign Immunity Act, 42 Pa.C.S.

4. PennDOT does not challenge plaintiffs' contention that the design and construction of Powder Valley Road at the crash site was a dangerous condition "of" Commonwealth realty. Therefore, the issue is not before this court.

5. We do not agree that *Fidanza* is entirely dispositive of the issue before us. The precise issue in *Fidanza* was whether the alleged dangerous conditions or another driver caused the injuries to plaintiffs. *Fidanza,* 655 A.2d at 1079. Here, we must decide preliminarily whether or not the alleged dangerous conditions were "of" or "on" the realty. See *Rothermel v. PennDOT,* 672 A.2d 837, 842 (Pa.Commw. 1996).

§8521 et seq., unless a plaintiff shows that: (1) the damages arising out of a negligent act would be recoverable under statutory or common law notwithstanding the defense of sovereign immunity; and (2) the negligent act falls within one of the enumerated exceptions to immunity at 42 Pa.C.S. §8522(b). *Smith v. PennDOT,* 700 A.2d 587 (Pa. Commw. 1997).

In the case sub judice, plaintiffs have met the first requirement by establishing the elements of common-law negligence against PennDOT.[6] Support for that claim is found in the arguments that the failure to remove anti-skid material and the substandard design of SR 2025 constitutes negligence.

Our Supreme Court has held "clearly and unequivocally" that PennDOT owes a general duty of care to the users of its real estate which "require[s] that the condition of the property [be] safe for the activities for which it is regularly used, intended to be used or reasonably foreseen to be used." *Bendas v. Township of White Deer,* 531 Pa. 180, 183, 611 A.2d 1184, 1186 (1992) (quoting *Snyder v. Harmon,* 522 Pa. 424, 435, 562 A.2d 307, 312 (1989)). Pennsylvania appellate courts have interpreted PennDOT's common-law duty to make its property safe to include a duty to properly design and construct highways, *Smith, supra,* as well as a duty to reduce risks posed by a variety of other highway conditions, see, *e.g.,* Rothermel v. PennDOT, 672 A.2d 837 (Pa. Commw. 1996) (duty to reduce danger

---

6. The elements of a negligence cause of action are: (1) legal duty or obligation to protect others against an unreasonable risk of harm; (2) failure to perform the duty or obligation according to a certain standard; (3) a reasonably close causal connection between the complained of conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another. *Fidanza, supra,* 655 A.2d at 1078.

posed by steep cliffs and embankments in close proximity to the highway by erecting guardrails or other barriers), and *Bendas, supra* (duty to erect traffic control devices, signs, or warnings to alleviate a dangerous condition). PennDOT also has a *general* statutory duty to maintain and repair roads and highways under its jurisdiction. *Rothermel,* 672 A.2d at 841 n.6 (citing section 407 of the State Highway Law, Act of June 1, 1945, P.L. 1242, 36 P.S. §670-407 and section 2002 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §512(a)(8) (emphasis added)).[7]

Naturally, a duty to maintain the condition of the Commonwealth's highways would include a duty to inspect for and remove any *unnatural* and *artificial* accumulation of a foreign substance, *i.e.,* anti-skid material, on the roadway which could create an unreasonably dangerous condition for vehicular traffic. This would be true especially where PennDOT itself placed the foreign substance on the roadway, or alternatively, caused the material to be placed there. This court is keenly aware of the body of case law which imposes no common-law duty upon PennDOT for the *natural* accumulation of substances on a roadway which create

7. Compare *Babcock v. PennDOT,* 156 Pa. Commw. 69, 75, 626 A.2d 672, 674 (1993), *alloc. denied,* 536 Pa. 647, 639 A.2d 33 (1994). The court held that PennDOT does not have a duty to maintain *all* property within its *unopened* right-of-way. In *Babcock,* the plaintiff's car left the cartway, went into a ditch on its side, overturned, and skidded along the ditch and up an embankment where it collided with a tree or log some distance from the shoulder of the road. *Id.* at 71, 626 A.2d at 673. The court concluded that such a duty would place an intolerable burden upon the agency, and that the right-of-way off the highway (a term encompassing both the cartway and the berm) was not intended to be used or regularly used for vehicular travel.

a dangerous condition. See *e.g., Huber v. PennDOT,* 122 Pa. Commw. 82, 551 A.2d 1130 (1988), *alloc. denied,* 525 Pa. 637, 578 A.2d 931 (1989) (no duty to remove or treat natural accumulations of ice and snow). However, PennDOT will be liable for an unreasonably dangerous *artificial* condition which it creates or knows to exist. See *Fidanza, supra* (plaintiffs would have a cause of action against PennDOT at common law if plaintiffs can establish that PennDOT had actual or constructive notice that a dangerous condition existed because there were improper shoulders, no guardrails and/or debris on side of road); *PennDOT v. Weller,* 133 Pa. Commw. 18, 574 A.2d 728 (1990) (plaintiff had cause of action based on DOT's negligent conduct in piling snow and ice in such a fashion that it formed a "ramp" over the berm and guardrail which the decedent's vehicle ascended); *PennDOT v. Phillips,* 87 Pa. Commw. 504, 488 A.2d 77 (1985) (PennDOT has common-law duty to warn and correct a dangerous ice condition and may be held liable for failure to do so after it receives actual notice of the condition).

Plaintiffs support their allegations of negligence against PennDOT with, *inter alia,* the report by their expert, Mr. Robson. Mr. Robson made the following pertinent findings concerning conditions at the crash site:

"(1) SR 2025 is substandard in shoulder ... stopping sight distance and curvature.

"(2) There was loose stone on the roadway surface which lowered the friction between the tires and the pavement surface. The loose stone along the curve was a dangerous condition. . . .

"(4) The movement of the Kneller vehicle is consistent with a loss of control due to differential surface friction.

This differential friction was the result of the loose gravel on the roadway surface.

"(5) Failure to recognize the unsafe condition created by and to remove the loose stone from the road surface was not consistent with prudent highway maintenance procedures, and [PennDOT's] own stated maintenance procedures, and resulted in a dangerous condition that was a cause of the crash." (Robson report at 24.)

The evidence provided by plaintiffs' expert, if believed by the fact-finder, establishes that PennDOT breached its common-law duty to provide safe conditions on SR 2025 and that its breach created a dangerous condition which caused Melissa Hart's injuries. However, this does not end the analysis. Plaintiffs also must show that PennDOT's alleged negligent acts fall within an exception to sovereign immunity.

Accordingly, plaintiffs argue that the agency's actions fall within the real estate exception as set forth in 42 Pa. C.S. §8522(b)(4). The relevant portion of section 8522(b) provides:

"*Acts which may impose liability.*—The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by: . . .

"*Commonwealth real estate, highways and sidewalks.*—A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency . . . ." 42 Pa.C.S. §8522(b)(4).

Generally, the question of what constitutes a "dangerous condition" is one of fact for the jury. *Rothermel, supra,* 672 A.2d at 842. However, prior to that determination the trial court must decide as a matter of law whether or not the condition is one that will invoke the real estate exception. *Id.* Specifically, two requirements must be met: (1) the condition must be "of" the realty; and (2) the condition must cause the injury and not merely facilitate it. *Id.,* 672 A.2d at 842-43; see also, *Snyder, supra.*

To be "of" the realty, an artificial condition or defect must "derive, originate from or have as its source the Commonwealth realty." *Rothermel,* 672 A.2d at 842 (quoting *Snyder, supra*). Where PennDOT has created an unnatural and artificial dangerous condition on its roadway, the condition will be considered "of" the realty for purposes of the real estate exception. See *e.g., Rothermel* (administrators may recover for injuries caused by an unnatural and artificial accumulation of ice and snow resulting from a defectively designed and maintained roadway); *Weller, supra* (PennDOT's negligent piling of snow and ice was an artificial condition of the land itself under real estate exception).

Courts have not applied the exception where an alleged dangerous condition was a result of the natural accumulation of a foreign substance on the roadway or the acts of third parties whose acts are outside the scope of the statute. See *e.g., Abella v. City of Philadelphia,* 703 A.2d 547 (Pa. Commw. 1997) (immunity for Commonwealth where plaintiff fell on naturally occurring hills and ridges of ice and snow); *Finn v. City of Philadelphia,* 541 Pa. 596, 664 A.2d 1342 (1995) (immunity for city where plaintiff fell on sidewalk covered in grease which was placed there by unidentified person(s)); *Shedrick v. William Penn School District,*

654 A.2d 163 (Pa. Commw. 1995), *alloc. denied,* 542 Pa. 682, 668 A.2d 1142 (1995) (immunity for high school where student fell on terrazzo floor made wet by rainwater tracked into the school building by others) (citing cases).

With all the foregoing principles in mind, we conclude that PennDOT is not immune from liability for the accumulation of anti-skid material on its roadway. First, there is a causal relationship between the alleged dangerous condition and the injuries sustained by Melissa Hart. Plaintiffs' expert report supports the finding that a dangerous accumulation of anti-skid material and the roadway design caused the vehicle to slide off the roadway. Second, the anti-skid material was an artificial condition "of " the Commonwealth realty. Anti-skid material is not a naturally occuring phenomenon on the roadways of this Commonwealth. Moreover, the material was not deposited by unknown or unidentified parties over which PennDOT had no authority or control, or whose acts were outside the sovereign immunity statute's scope of liability. PennDOT itself deposits this material on its roadway surfaces in the winter months to *alter the condition of the realty, i.e.,* to lessen the dangers posed by snow and ice. Once deposited, the material becomes an integral part of the roadway.

In this case, plaintiffs' evidence shows that PennDOT authorized Upper Milford Township to put the material on SR 2025 pursuant to a contract between the township and the agency. After the contract expired, PennDOT allowed the material to remain on the roadway for approximately four months until the time of the accident in late summer. (Robson report at 7-8.) PennDOT is alleged to have known that the material was on SR

2025 and, according to its own safety standards, should have been removed. (*Id.* at 7-10.) Considering the evidence in the light most favorable to the non-moving party, we conclude that the anti-skid material was an unnatural and artificial condition created by PennDOT and which PennDOT allowed to continue to exist in an allegedly dangerous state.[8] Therefore, the accumulation of the anti-skid material is a condition "of" the realty for purposes of the real estate exception.[9]

---

8. If plaintiffs are successful at trial in proving that the accumulation of anti-skid material and the design and construction of SR 2025 were dangerous conditions for which PennDOT is liable, then PennDOT will be held accountable for all proximately caused injuries including those aggravated by the Kneller vehicle's impact with the utility pole. See *Rothermel, supra,* 672 A.2d at 843 n.10.

9. PennDOT argues that holdings of *Abella, supra,* and *Finn, supra,* require this court to find that the anti-skid material was a condition "on" the realty and not "of" it thereby absolving PennDOT of liability under sovereign immunity. We do not agree. Both cases are distinguishable from the within case.

In *Abella,* the defect complained of was the formation of hills and ridges from a *natural* accumulation of ice and snow on a walkway adjacent to the State Office Building. The Commonwealth Court relied on its holding in *Finn,* which the Supreme Court later affirmed, when it stated:

"We will not impose liability for injuries caused by a negligent failure of the government entity to remove a foreign substance from the real estate or the sidewalk. Since ice, snow, oil, and grease and all foreign substances which can *naturally* accumulate on the sidewalk or real estate itself, government entities are not liable for injuries caused solely by the presence of these substances . . . ." *Abella,* 703 A.2d at 550. (citation omitted) (emphasis added) Although the court was "somewhat unsettled" that the viability of the "of"/"on" distinction in *Finn* would remain controlling in the future, it declined to find the real estate exception applicable in that case. *Id.,* 703 A.2d at 550-51.

574

The question of whether or not the anti-skid material and the design and construction of SR 2025 constituted a "dangerous condition" for purposes of the sovereign immunity statute is one for the fact-finder to resolve. In light of Mr. Robson's report, excerpted above, plaintiffs have provided prima facie evidence of an alleged dangerous condition and have created a genuine issue of material fact on this issue.

On the other hand, we conclude that the agency is immune from liability for injuries sustained due to the location of the utility pole in this case. The utility pole did not cause the injuries to Melissa Hart; it "merely" facilitated them.[10] As stated above, the dangerous accumulation of anti-skid material caused the vehicle to

In *Finn,* the Supreme Court affirmed the Commonwealth Court's holding that the sidewalk exception to the Political Subdivision Tort Claims Act did not apply to injuries sustained from a fall on a grease-covered city sidewalk. (At the time, the real estate exception in the governmental immunity statute, *i.e.,* the Political Subdivision Tort Claims Act, and the sovereign immunity statute were interpreted similarly. However, this practice has been put into question by *Grieff v. Reisinger,* 548 Pa. 13, 693 A.2d 195 (1997), and *Abella.*) In affirming the *Finn* decision, the court's conclusion highlights the distinctions between *Finn* and the case sub judice:

"What is necessary, therefore, to pierce the Commonwealth agency's immunity is proof of a defect of the sidewalk itself. Such proof might include an improperly designed sidewalk, an improperly constructed sidewalk, or a *badly maintained,* deteriorat[ed], crumbling sidewalk. Here, however, we have no such allegation or proof. We have a *perfectly designed and constructed* sidewalk, undamaged, upon which an *unidentified* individual or individuals deposited a foreign substance which caused appellant's injury." *Finn* at 605, 664 A.2d at 1346. (emphasis added)

10. The Commonwealth Court in *Rothermel, supra,* made a distinction between the cause of the accident and the cause of the injury for determining the applicability of the real estate exception. Specifically the court stated:

slide off the roadway, and eventually, impact the pole. The pole could not have injured Melissa Hart unless the vehicle first slid off the roadway. See *Babcock, supra* at 74, 626 A.2d at 674. As a matter of law, the real estate exception is not applicable to the alleged dangerous condition created by the pole because the pole did not cause the accident.[11]

#### (b) *Causation*

PennDOT also argues that Plaintiffs' expert report failed to establish that the alleged lack of stopping sight distance and curvature of SR 2025 were a substantial factor in the happening of the accident. Plaintiffs dispute this assertion and further state that a layperson, by application of common sense and without the assistance of expert testimony, could find that the alleged dangerous conditions of SR 2025 caused Melissa Hart's injuries.

"Whether a party's conduct has been a substantial factor in causing injury to another is ordinarily a question of fact for the jury, and may be removed from the

"It is important to recognize the distinction between the cause of the *accident* and the cause of the *injuries* resulting from the accident. For purposes of deciding the applicability of the real estate exception to sovereign immunity, it is the cause of the *accident*—the event that set the accident in motion—that is determinative." *Rothermel,* 672 A.2d at 842 n.8 (emphasis supplied); see also, *Sprenkle v. Commonwealth,* (C.P. Northumberland, April 27, 1998) (Wiest, J.) (no. CV 96-177) (guiderail not the cause of the accident, and therefore, Commonwealth was immune from liability, where decedent lost control of his vehicle, crossed center line, drove through berm of the opposite lane and collided with guiderail).

11. We agree with PennDOT that the utility pole is not a fixture. However, because we find no causation under the real estate exception, we need not address the issue of whether the utility pole is "of" the Commonwealth realty.

jury's consideration only where it is so clear that reasonable minds cannot differ on the issue." *Vernon v. Stash,* 367 Pa. Super. 36, 46, 532 A.2d 441, 446 (1987). Here, plaintiffs' expert report and the deposition testimony of Aaron Kneller create a genuine issue of material fact as to what combination of conditions of SR 2025 caused the Kneller vehicle to impact the pole. Therefore, the question of whether or not the alleged substandard design and construction of SR 2025, including the alleged lack of sight distance and curvature, was a substantial factor in bringing about harm is for the fact-finder to resolve.

For all the foregoing reasons, we conclude that PennDOT is not immune from liability for the accumulation of anti-skid material on SR 2025, and there is sufficient evidence to present the issue of causation regarding the alleged substandard design of the roadway to the jury.

## ORDER

And now, June 17, 1998, upon consideration of the motions for summary judgment by defendants PennDOT and PP&L, plaintiffs' responses thereto, and after oral argument thereon;

It is hereby ordered that the motion of defendant PennDOT is granted in part and denied in part for the reasons expressed in the accompanying opinion;

It is further ordered that the motion of defendant PP&L is granted for the reasons expressed in the accompanying opinion;

It is further ordered that all claims and cross-claims against defendant PP&L are dismissed with prejudice, and that the clerk of courts, civil division, is directed to mark the docket accordingly.